IN THE SUPREME COURT OF THE STATE OF DELAWARE

SARN SD3, LLC,                          §
                                        §
   Plaintiff Below,            §
   Appellant/Cross-Appellee,   §     Nos. 291, 2023 & 294, 2023
                                        §
   v.                          §     Court Below:  Superior Court
                                        §     of the State of Delaware
CZECHOSLOVAK GROUP A.S.,                §
                                        §     C.A. No. N17C-12-185
   Defendant Below,            §
   Appellee/Cross-Appellant.   §


Submitted:   July 10, 2024
Decided:     September 12, 2024


Before **SEITZ**, Chief Justice; **VALIHURA**, **TRAYNOR**, **LEGROW**, and **GRIFFITHS**, Justices, constituting the Court *en Banc*.

Upon appeal from the Superior Court.  **AFFIRMED**.

Mackenzie M. Wrobel, Esquire, Coleen W. Hill, Esquire, Duane Morris, Wilmington, Delaware; Ryan E. Borneman, Esquire, Robert M. Palumbos, Esquire (*argued*), Ryan F. Monahan, Esquire, Duane Morris, Philadelphia, Pennsylvania *for Plaintiff Below, Appellant/Cross-Appellee.*

Philip Trainer, Jr., Esquire, Tiffany Geyer Lydon, Esquire, Ashby & Geddes, Wilmington, Delaware; *Of Counsel*:  Kenneth J. Pfaehler, Esquire (*argued*), Anna Isernia, Esquire, Dentons US LLP, Washington, D.C. *for Defendant Below, Appellee/Cross-Appellant.*

**VALIHURA, J.**

## I. INTRODUCTION

This appeal arises out of a breach of contract action brought by SARN SD3 LLC ("SD3") against Czechoslovak Group A.S. ("CSG"). SD3 alleged that CSG breached an option contract for shares in RETIA A.S. ("RETIA"). RETIA is a Czech company purchased by CSG in 2016. The option contract provided that if CSG ceased to own a majority of RETIA before SD3's call option expired, then CSG would pay SD3 a contractual "Penalty Amount" equal to 25% of the difference between the exercise price of 540,000,000 CZK and the value of RETIA based on an "Independent Valuation." To determine the Independent Valuation, the two entities could either agree on RETIA's value or, if that failed, each could hire a Big Four accounting firm that would conduct a valuation and the two valuations would be averaged.

CSG sold RETIA, triggering the Penalty Amount, and the parties fought over access to valuation information. SD3 filed suit. After the Big Four accounting firms issued their reports, SD3 sought summary judgment regarding the Penalty Amount. The Superior Court granted SD3's entitlement to the Penalty Amount and calculated the underlying Independent Valuation as the average of the two valuations, over CSG's objections that it should have been able to challenge SD3's valuation methodology. In a later supplemental ruling, the court determined that SD3's valuation had been independently determined and was the product of good faith and fair dealing.

Nearly a year-and-a-half after these rulings, SD3 brought a Rule 37 Motion for sanctions alleging that CSG had withheld important valuation documents, namely, the "J&T Documents." SD3 believed that these documents contained information about a

2

contract that would have increased the Independent Valuation amount and, in turn, the Penalty Amount. SD3 asked the court to allow the parties to "redo" their valuations so that the court could revise its summary judgment ruling. The court denied the motion finding that Rule 37 sanctions were not warranted and that the relief sought was better suited to an analysis under Rule 60(b) as to whether the J&T Documents were newly discovered evidence.

SD3 filed its Rule 60 Motion, which the Superior Court also denied. Following some additional limited discovery, the court found that the documents at issue were not newly discovered because SD3 had them in its possession for seven months before the court ruled on the Penalty Amount. Nor did the court find any exceptional circumstances warranting relief.

SD3 appeals the Superior Court's denial of the Rule 37 and Rule 60 motions.[1] In addition, SD3 challenges the Superior Court's request that SD3 submit a proposed order in United States dollars ("USD") rather than Czech crowns ("CZK"), and the Superior Court's use of the conversion rate as of June 20, 2017 ("Valuation Date") as the conversion rate for the Penalty Amount.

---

[1] This matter was assigned to the Complex Commercial Litigation Division of the Superior Court. On June 8, 2022, the Superior Court denied SD3's Motion for Sanctions for Non-Compliance with Discovery Orders pursuant to Civil Rule 37. Ex. C to Opening Br. (Order Denying SARN SD3 LLC's Motion for Sanctions for Noncompliance with Discovery Orders [hereinafter "*2022 Decision*"]); App. to Answering Br. at B4557–58, Tab 79 (*2022 Decision*). The Court denied the motion without prejudice, allowing SD3 to refile its motion under Civil Rule 60. On April 27, 2023, the Superior Court also denied SD3's Rule 60 Motion to Amend the Court's Count I Decision. *SARN SD3, LLC v. Czechoslovak Grp. A.S.*, 2023 WL 3145917, at *5 (Del. Super. Ct. Apr. 27, 2023), *appeal dismissed*, 300 A.3d 679, 2023 WL 4316891 (Del. July 3, 2023) (TABLE) [hereinafter "*2023 Decision*"].

3

On cross-appeal, CSG challenges the two Superior Court summary judgment decisions below on multiple grounds, contending primarily that the Superior Court erred by entering partial summary judgment and by precluding full discovery.[2]

For the following reasons, we AFFIRM the judgment of the Superior Court.

## II.   RELEVANT FACTUAL AND PROCEDURAL BACKGROUND

### A. Underlying Facts[3]

#### 1. The Parties

SD3 is a Delaware limited liability company with its principal place of business in Washington, D.C.  SD3 provides advisory and consulting services to companies in the defense industry.[4]  CSG is a Czech Republic holding company that operates and supports several enterprises in the defense industry.  Non-party RETIA is a joint stock company registered under the laws of the Czech Republic.  RETIA specializes in the field of military electronics, with an emphasis in radar and non-military recording systems.

---

[2] *SARN SD3, LLC v. Czechoslovak Grp. A.S.*, 2020 WL 12719975, at *1 (Del. Super. Ct. Dec. 23, 2020) [hereinafter "*2020 S. J. Decision*"]; *SARN SD3, LLC v. Czechoslovak Grp. A.S.*, 2021 WL 5710897, at *1 (Del. Super. Ct. Nov. 15, 2021) [hereinafter "*2021 Supplemental Decision*"].

[3] The facts are derived primarily from the *2020 S. J. Decision* and are supplemented with references to documents contained in the record on appeal.  Neither party provided this Court with a user-friendly appendix.  There were issues with missing documents and repetitive documents.  Most of the Bates numbers in SD3's printed Appendix ("App. to Opening Br.") were unreadable, and CSG's Appendix ("App. to Answering Br.") contained repeated page numbers, making the Court's task in locating documents extraordinarily difficult and time-consuming.

[4] App. to Answering Br. at B1104, Tab 38 (SD3 Motion for Partial Summary Judgment [hereinafter "MSJ at _"] at 3).

4

### 2. *The Call Option Agreement*

On March 30, 2016, CSG purchased RETIA for 540,000,000 CZK. Seven months later, on October 7, 2016, SD3 and CSG signed a Call Option Agreement ("Agreement"), which granted SD3 the option to purchase a 25% equity interest in RETIA.[5] The Agreement provided that SD3 could exercise its option on or before July 1, 2021. If CSG ceased to own the majority of RETIA's shares, then CSG was required to pay SD3 a contractually prescribed "Penalty Amount."[6] The Agreement states that the Penalty Amount equals 25% of the difference between the value of RETIA, based on an "Independent Valuation of the Company," and the exercise price of 540,000,000 CZK.[7] The exercise price was determined, in part, by the price that CSG paid for RETIA. Section 1.3 of the Agreement provides that "[t]he '**Exercise Price**' of the Shares to be paid by the Grantee to the Grantor shall be equal to CZK 5,400.000 per 1% of the Shares, which is an amount calculated using the price that the Grantor paid to acquire the Shares."[8]

Section 2.4 of the Agreement anticipated a change in control of RETIA. Specifically, Section 2.4.1 states:

> 2.4.1 If at any time during the Option period (i) the holder of a majority of Shares ceases to be the Grantor or a member of the group to which the Grantor belongs or the Company transfers a substantial part of its assets without adequate consideration, and (ii) the Grantee does not want to exercise its Option to purchase the Exercised Shares, the Grantors shall pay to the Grantee upon its written demand a contractual penalty equaling an

---

[5] *Id.* at B108, Tab 2 (Call Option Agreement [hereinafter "Agreement"] § 1.2).

[6] *2020 S. J. Decision*, 2020 WL 12719975, at *1–2; App. to Answering Br. at B110, Tab 2 (Agreement § 2.4.1).

[7] App. to Answering Br. at B110, Tab 2 (Agreement § 2.4.1).

[8] *Id*. at B108, Tab 2 (Agreement § 1.3).

amount in CZK (or its equivalent in US dollars) equal to 25% multiplied by the difference between (x) the value of the Company based on the "Independent Valuation of the Company", as defined below, and (y) the valuation of the Company based on the Exercise Price (i.e. CZK 540,000.000) /the "**Penalty Amount**"/. To avoid any doubts, the Grantee is entitled to the Penalty Amount under the previous sentence only if conditions set out in the Article 2.4.1 point (i) have been met and if the value of the Company based on the "*Independent Valuation of the Company*" is higher than the value of the Company based on the Exercise Price.[9]

Section 2.4.2 of the Agreement defines "Independent Valuation of the Company" ("Independent Valuation") as either (i) a value determined by mutual agreement of the parties within fourteen days following notice of change in control of RETIA; or (ii) if the parties are unable to agree upon RETIA's value, the average of the valuations of RETIA by two Big Four accounting firms, one retained by CSG and the other by SD3.[10] Section 2.4.2 states in its entirety:

> The Independent Valuation of the Company equals the valuation of the Company as agreed upon by the Grantor and the Grantee in writing on a date no later than 14 days following the initial notice of the Grantor to the Grantee of the change in control. In the event the Grantor and the Grantee do not reach an agreement within 14 days following such notice, each of the Grantor and the Grantee shall hire a Big Four accounting firm, and the Independent Valuation of the Company shall equal the average of the two valuations. Any cost and expenses of such accounting firms shall be borne equally by the Grantor and the Grantee.[11]

### 3. *The Sale of RETIA*

On June 20, 2017, CSG sold RETIA to Technology CS, a company owned by CSG's

---

[9] *Id*. at B110, Tab 2 (Agreement § 2.4.1) (emphasis added).

[10] *Id*. at B111, Tab 2 (Agreement § 2.4.2).

[11] *Id*.

CEO, Michael Strnad,[12] for 381,200,000 CZK. The purchase price was based upon a valuation of RETIA conducted by Grant Thornton.[13] In connection with the transaction, J&T Banka requested information for the purpose of calculating a loan amount. Several months later, on November 5, 2017, CSG notified SD3 that CSG had transferred its shares in RETIA and was initiating the Independent Valuation of RETIA provided for in Section 2.4.2. SD3 thereafter requested documents concerning RETIA's financial information "so that the parties [could] engage in a good faith discussion concerning the independent valuation of RETIA."[14] Characterizing SD3's requests as sweepingly overbroad, CSG declined to provide SD3 with all of the documents it sought. Unable to agree upon RETIA's valuation, CSG did not pay SD3 within the fourteen-day period.

### B. Procedural History

#### 1. The Complaint

SD3 filed its original complaint on December 13, 2017. The Superior Court granted in part and denied in part CSG's motion to dismiss the complaint on September 13, 2018. SD3 filed an Amended Complaint on September 28, 2018. CSG filed its Partial Answer on October 12, 2018, and then its Amended Answer and Counterclaim on February 25, 2019.

---

[12] *Id*. at B2467, Tab 40 (Opp. to MSJ at 6). This was an intra-family sale. *Id.* at B3801, Tab 61 (Transcript of Motion Hearing on August 21, 2020 [hereinafter "Aug. 2020 Hearing Trans. at _"] at 8:5–11).

[13] *Id*. (Opp. to MSJ at 6 (citing App. to Answering Br. at B2925 (Grant Thornton Valuation at 46))). *See generally id.* at B2882–928, Tab 43 (Grant Thornton Valuation).

[14] App. to Opening Br. at A122 (Amended Complaint at 3 ¶ 14).

In Count I of the Amended Complaint, SD3 alleged that CSG had breached the Agreement in connection with determining the Penalty Amount.[15] In Count II, SD3 alleged that CSG had breached a "contractual 'fiduciary duty.'"[16] CSG filed a counterclaim for defamation. The parties eventually settled Count II and the counterclaims.[17] The only claim before this Court on appeal is Count I, concerning the Penalty Amount damages.

2. *The Valuation Reports*

Consistent with Section 2.4.2 of the Agreement, SD3 and CSG each hired a Big Four accounting firm to conduct a valuation and produce a valuation report of 100% of shares of RETIA as of the Valuation Date, June 20, 2017. On July 24, 2018, SD3's attorneys retained PricewaterhouseCoopers ("PwC") on SD3's behalf.[18] On August 21, 2018, CSG retained Ernst & Young ("EY").

The accounting firms did not agree on the value of RETIA. EY issued its report on March 5, 2019 ("EY Report"), estimating that the fair value of the 100% shareholding in

---

[15] *Id.* at A129 (Amended Complaint at 10 ¶¶ 50–57).

[16] *Id*. at A130 (Amended Complaint at 11 ¶¶ 58–63).

[17] The parties settled Count II of the Amended Complaint, and the counterclaims were dismissed on August 3, 2022. *See* App. to Answering Br. at B5814, Tab 105 (Order dated July 17, 2023).

[18] PwC summarized the scope of its engagement by SD3 and the purpose of the PwC Report as follows: "I was instructed by SARN SD3 LLC ("Plaintiff" or "SARN") to act as an expert witness and prepare an independent and objective valuation of a 100% shareholding in RETIA a.s. ("RETIA" or "Company") as of 20 June 2017 (the "Valuation date")." *2020 S. J. Decision*, 2020 WL 12719975, at *5; App. to Answering Br. at B3199, Tab 45 (Expert Report of Abdul Sirshar Qureshi [hereinafter "PwC Report at _"] at 1). CSG pointed to these and other statements as evidence that PwC's report was a litigation-driven exercise as opposed to an independent business valuation of RETIA. *See* App. to Answering Br. at B2475, Tab 40 (Opp. to MSJ at 14) ("Mr. Qureshi's retainer agreement makes clear that he is not independent, but working at the direction and under the influence of SARN's litigation counsel in this action.").

RETIA at 555,000,000 CZK. Discovery disputes then interrupted the resolution of the valuation process.

During discovery, CSG produced a copy of the EY Report to SD3's litigation counsel but designated it as "Highly Confidential."[19] Given that designation, SD3 could not access or review the EY Report, nor could PwC speak with SD3 concerning assumptions or approaches taken by EY in the EY Report. After SD3 made repeated requests to remove that designation and filed a Motion to Vacate Confidentiality Designations, the Superior Court, on October 28, 2019, ordered CSG to re-designate the EY Report from "Highly Confidential" to "Confidential" and to produce it to SD3 in unredacted form.[20] CSG finally produced the re-designated EY Report on November 15, 2019.

PwC made its first formal document request to RETIA on November 14, 2019.[21] Further discovery skirmishes necessitated a telephonic hearing held on December 20, 2019.[22] The court extended the January 17, 2020 deadline for PwC to produce its report to March 3, 2020.

On January 8, 2020, SD3 filed a Motion to Compel Discovery. On January 10,

---

[19] App. to Answering Br. at B670–716, Tab 24 (Oct. 28, 2019 Hearing Transcript at [hereinafter "Oct. 2019 Hearing Trans. at _"] at 2:5–48:7).

[20] *Id*. at B708, Tab 24 (Oct. 2019 Hearing Trans. at 40:1–3) ("Now, you can stamp it 'confidential,' but is has to be released in unredacted form to the opposing side.").

[21] App. to Opening Br. at A320–21 (SD3's Request for Information at 3–4).

[22] App. to Answering Br. at B749, Tab 27 (Dec. 20, 2019 Teleconference Transcript [hereinafter Dec. 2019 Conf. Trans. at _"] at 3:15–16); *id.* at B758, Tab 27 (Dec. 2019 Conf. Trans. at 12:7–8) (the court observed that the parties were "layering in litigation antics to a business valuation system.").

2020, CSG filed a Motion to Compel Discovery. The parties resolved the cross-motions to compel by an agreement reached around February 10, 2020.[23] On February 19, 2020, SD3 specifically requested the documents at the center of this dispute, namely, "[c]ommunications with J&T Banka or Commerzbank regarding financing for CSG or RETIA, including the financing of Michal Strnad's purchase of RETIA from CSG, including the current loan agreement, the application to obtain financing, and the decision to provide financing."[24] Before CSG could respond to this request, PwC issued its report on March 10, 2020 (the "PwC Report"). The PwC Report determined RETIA's value on June 20, 2017 to be 980,000,000 CZK, an 81% increase over the exercise price provided in the Call Option Agreement and more than 75% higher than the Independent Valuation prepared by EY.[25]

Thereafter, on May 22, 2020, in response to that February 19 request, CSG delivered over 12,000 documents. Although this production occurred after SD3's production of the PwC report and after SD3 had filed its motion for partial summary judgment, the general deadline for discovery at that time was June 19, 2020, and the deadline for dispositive motions was not until October 9, 2020.[26] Thus, SD3 filed its summary judgment motion before the dispositive motion deadline and before receiving the J&T Documents it had

---

[23] *Id.* at B5576, Tab 88 (Feb. 10, 2020 Email from CSG's counsel to the Superior Court) ("The parties are pleased to jointly report that they are withdrawing their respective motions to compel without prejudice, as they are in the process of resolving the issues in the motions. As such, we do not believe there is a need for a hearing at this time.").

[24] *Id.* at B5582, Tab 88 (Feb. 19, 2020 Email Requests from SD3 to CSG).

[25] *Id.* at B3203, Tab 45 (PwC Report at 5).

[26] *Id.* at B1004–05, Tab 33 (Feb. 11, 2020 Case Management Order at 2–3 ¶¶ 2, 4).

explicitly requested.

A principal driver of the discrepancy between the EY Report and the PwC Report was PwC's consideration of a potential contract between RETIA and an Israeli company, ELTA (the "MADR contract").[27] The J&T Documents contained information concerning the MADR contract. These documents consisted of an email with attachments transmitted from CSG's Head of Treasury to J&T Banka on June 19, 2017, the day before the Valuation Date.[28] SD3 would later argue in its Rule 37 motion that these documents consisted of a "RETIA-prepared business plan for the period 2017–2021" and showed that "RETIA considered *and represented to a banking authority*, specifically for purposes of inducing that lender into making a loan, that the full value of the MADR Contract should be calculated as part of RETIA's value."[29] PwC assessed the probability that the contract would be entered into by June 20, 2017 at 100%. CSG would later challenge that assumption and the relevance of the J&T Documents.[30]

---

[27] According to Qureshi, the main differences between the reports included the following: EY did not include the MADR contract and PwC did include it; EY used a 10.0% EBITDA margin and PwC used a 13.6% EBITDA margin; EY used a 12.6% discount rate and PwC used a 10.9% discount rate; PwC and EY used a 20% net revenue for operating level of cash, however the firms used different technical assumptions for calculating net working capital and terminal value; and EY included a one-off investment of 40,000,000 CZK for building extension and PWC used no one-off capital expenditures. *Id*. at B3203–04, Tab 45 (PwC Report at 5–6).

[28] App. to Opening Br. at A638 (Rule 37 Motion at 7 ¶ 17).

[29] *Id*. (emphasis in original).

[30] App. to Answering Br. at B3203, Tab 45 (PwC Report at 5). After discovering the J&T Documents, Qureshi modified his report. *Id*. at B4691, Tab 85 (Supplementary Report to the Expert Report of Abdul Sirshar Qureshi [hereinafter "Second PwC Report"] at 8). Qureshi believed that the J&T Documents were the most contemporaneous reflection of RETIA's perspective on its own value and projects, and the J&T Documents included the MADR project. Because the J&T Documents contained the MADR project, Qureshi added the value of the MADR Servicing Project because he believed it was intertwined with the MADR project. *Id*.

### 3. Motion for Partial Summary Judgment

On March 30, 2020, SD3 filed its motion for partial summary judgment concerning the Penalty Amount claim. According to SD3, there was no genuine issue of material fact in dispute because (1) neither party disputed the valid and enforceable nature of the Agreement; (2) neither party disputed that CSG had triggered its obligation to pay a penalty amount by selling RETIA; and (3) the damages were easily calculable under the Agreement.[31] SD3 then calculated the Penalty Amount using the formula set forth in the Agreement, at "***56,875,000* CZK**[.]"[32] SD3 additionally requested prejudgment interest of $508,568.25 USD, for a total of $3,016,284.30 USD.

In its May 14, 2020 opposition, CSG argued that the PwC Report was not a valuation report, but instead, was a litigation-driven expert report. It asserted that SD3 had failed to produce the underlying documents relied upon by Qureshi, and that the communications between Qureshi, SD3, and SD3's attorneys would show that the PwC valuation was not independent.[33] CSG argued that "Section 2.4 is not an arbitration provision," and that the

---

at B4692, Tab 85 (Second PwC Report at 9). The MADR servicing project was included in May and July 2017 management reports and mentioned in the media. *Id.* at B4692–93, Tab 85 (Second PwC Report at 10). This inclusion caused the increase in valuation from 980,000,000 CZK to 1,526,000,000 CZK.

[31] *Id.* at B1115–19, Tab 38 (MSJ at 14–18).

[32] *Id*. at B1117, Tab 38 (MSJ at 16) (emphasis in original). SD3 used the conversion rate of 22.68 CZK to 1 USD from the PwC Report to convert the requested damages of 56,875,000 CZK to $2,507,716.05 USD. *Id.*

[33] *Id*. at B2462–64, Tab 40 (Opp. to MSJ at 1–3). *See also id*. at B2474–75, Tab 40 (Opp. to MSJ at 13–14) (providing the dictionary definition of "independent" and arguing the valuation should be independent and not controlled by the parties).

court did not simply have to accept the reports without challenge.[34]

CSG pointed to the inclusion of the MADR contract and weighting it with a probability of 100% as of June 20, 2017 as a key flaw in PwC's report. SD3 had pled in its Amended Complaint, filed in September 2018, that the MADR contract "remained unsigned."[35]

In its June 15, 2020 reply brief, SD3 argued that PwC's independence was not reasonably in dispute.[36] SD3 relied on Qureshi's representations of independence in the PwC report, and submitted a declaration from him (the Declaration of Abdul Sirshar Qureshi) ("Qureshi Declaration")[37] signed June 12, 2020. CSG asserted in its Sur-Reply Brief that it should be allowed to challenge the Qureshi Declaration through discovery. On appeal, CSG contends that it was sandbagged by SD3's reply brief submissions and should have been granted full discovery.

On December 23, 2020, the Superior Court deferred in part and granted in part SD3's motion for partial summary judgment ("*2020 S. J. Decision*").[38] The court stated

---

[34] *Id*. at B2464, Tab 40 (Opp. to MSJ at 3).

[35] App. to Opening Br. at A128–29 (Amended Complaint at ¶¶ 47, 48). The record shows that the MADR contract was signed in November 2019. App. to Answering Br. at B5227, Tab 85 (RETIA Responses to PwC's Request for Clarification) ("Before the MADR contract was signed, it was blocked by Mrs. Karla Šlechtová, former Minister of Defense of the Czech Republic.") ("[T]he implementation of the contract (in terms of conclusion of the contract between governments) was delayed and occurred only in 2019."); *id.* at B4885, Tab 85 (Dec. 20, 2019 Notes from PwC and RETIA Conference Call) ("MADR was signed at the end of November 2019, in 2017 speculation").

[36] App. to Answering Br. at B3165–73, Tab 44 (Reply Brief in Further Support of Motion for Partial Summary Judgment [hereinafter "MSJ Reply Br. at _"] at 9–17).

[37] *See generally id*. at B3183–91, Tab 45 (Declaration of Abdul Sirshar Qureshi 1–9).

[38] *2020 S. J. Decision*, 2020 WL 12719975, at *1.

that there was no dispute "that CSG triggered its obligations under Section 2.4 and has now breached the Agreement by failing to pay the Penalty Amount."[39] It held that "[t]he Agreement unequivocally states 'the Independent Valuation of the Company [*i.e.*, RETIA] shall equal the average of the two valuations.'"[40] The Exercise Price was 540,000,000 CZK. Because "EY valued RETIA at 555,000,000 CZK" and "PwC valued RETIA at 980,000,000[,]" the Superior Court calculated the Independent Valuation to be 757,500,000 CZK.[41] The Penalty Amount, 25% of the net difference of the Independent Valuation and the Exercise Price, came to 56,875,000 CZK.[42]

The court disallowed discovery into the methodologies undergirding the PwC report. It found this limitation to be consistent with the "plain and unambiguous language of section 2.4.2." because:

> Instead of calling for discovery and disputes, Section 2.4.2 provides that the Independent Valuation of the Company shall be the average of the two valuations. Moreover, Section 2.4.2 does not anticipate "independent" valuations by the two Big Four accounting firms. Instead, Section 2.4.2 just uses valuation without the using the term "independent valuations," and has each party paying for the costs associated with their retained Big Four accounting firm.[43]

The court concluded that "the 'Independent Valuation' relevant to this dispute is the average of two valuations completed by Big Four Accounting Firms."[44] The court also

---

[39] *Id*. at *10.

[40] *Id*. at *7, *10 (alteration in original) (quoting Agreement § 2.4.2).

[41] *Id*. at *10–11.

[42] *Id.*

[43] *Id*. at *11.

[44] *Id*. at *12.

noted CSG's inconsistent litigation positions, observing that CSG originally "took the position that SD3 could not challenge the independent valuation reached by EY or to assert that EY's valuation was calculated improperly" but now argued that CSG should be permitted to challenge the independent valuation reached by PwC or to assert that PwC's valuation was calculated improperly.[45]

When considering whether to allow additional discovery into the "independence" of the report and whether it had been issued in "good faith," the Superior Court considered the Qureshi Declaration. It found that the statements in the Declaration were "strong indicators of the independence of Mr. Qureshi and PwC," and that it had "no reason to believe that Mr. Qureshi would make improper declarations or sacrifice the reputation of PwC over this litigation."[46] However, because a number of the statements in his Declaration were "inconsistent with the PwC Retainer Agreement provisions[,]" the court allowed CSG to "test the inconsistencies in discovery."[47] Although the court did not allow CSG to "attack the method of calculating the valuation" it did allow "***LIMITED*** discovery relating to the implied covenant of good faith and fair dealing on the declarations listed

---

[45] *Id.* at *8. The Superior Court quoted one such objection lodged by CSG to such discovery:

> B. Defendant objects to the Definitions and Instructions to the extent they purport to seek documents or information *to allow [SD3] to challenge the independent valuation reached by EY or to assert that it is calculated improperly.* Many of the discovery requests appear to presume that [SD3] can attack the validity of the EY valuation by questioning whether the value should have been more. *But the Call Option Agreement does not contemplate or permit this claim.*

*Id.* at *7; App. to Answering Br. at B5168, Tab 85 (General Objection B) (emphasis added).

[46] *2020 S. J. Decision*, 2020 WL 12719975, at *13.

[47] *Id.*

15

above and the PwC Retainer Agreement."[48] CSG was permitted "no more than 3 document request[s] (including subparts) and a four-hour deposition of Mr. Qureshi."[49] The court deferred ruling on the remainder of the summary judgment motion pending this discovery.

### 4. *The November 15, 2021 Supplemental Decision*

On February 12, 2021, after CSG concluded this limited discovery, SD3 filed its Supplemental Submission Regarding the Independence of PricewaterhouseCoopers.[50] It argued that the additional discovery confirmed that Qureshi and PwC were independent, that his new deposition testimony was consistent with the declaration, and that the PwC report was Qureshi's "own and independent" valuation opinion.[51] Therefore, SD3 requested the court grant the deferred portion of SD3's motion for summary judgment and award the Penalty Amount, pre- and post-judgment interest, and attorneys' fees and costs.

CSG responded that Qureshi was not disinterested, and that even the limited discovery allowed revealed sufficient questions justifying fuller discovery. It pointed to the type and frequency of communication between Qureshi, SD3's representatives, and SD3's counsel as constituting an improper influence over the valuation process.

On November 15, 2021, the Superior Court issued its opinion on the deferred portion of the summary judgment motion, holding that the PwC Report was not the product

---

[48] *Id.*

[49] *Id.*

[50] App. to Answering Br. at B3552, Tab 61 (SARN SD3 LLC's Supplemental Submission Regarding the Independence of PricewaterhouseCoopers [hereinafter "MSJ Supp. Br. at _"). PwC produced an additional 2,580 pages of discovery, and CSG deposed Qureshi for four hours. *Id.* at B3554, Tab 61 (MSJ Supp. Br. at 2).

[51] *Id.* at B3556, Tab 61 (MSJ Supp. Br. at 4).

of a breach of good faith and fair dealing (the "*2021 Supplemental Decision*").[52] Even though PwC had been hired through SD3's litigation counsel, the record failed "to support a conclusion that PwC was improperly influenced by SD3, its agents, or its litigation counsel in arriving at the valuation in the PwC Report."[53] The court found that "[a] fair reading of the discovery here shows that the PwC Report does not breach a duty of good faith and fair dealing."[54] Additionally, it found that "[m]uch of the 'innuendo' or implication of influence is the result of the litigation and not a demonstration of bad faith."[55] The court also reviewed the PwC Retainer Agreement and "found that it seemed to indicate that SD3's litigation counsel will have input on valuation."[56] However, "Mr. Qureshi testified that SD3 did not influence the PwC Report's valuation. The record shows that Mr. Qureshi did independently evaluate RETIA. The record also shows that PwC was not dominated or controlled by SD3 when it came to the PwC Report."[57]

     5.   *Rule 37 Order June 8, 2022*

Although the J&T Documents had been produced to SD3 on May 22, 2020, it was not until March of 2022 that SD3's expert, PwC, identified what SD3 calls the J&T Business Plan ("J&T Documents"). PwC "discovered" the J&T Documents while

---

[52] *2021 Supplemental Decision*, 2021 WL 5710897, at *1.

[53] *Id.*

[54] *Id.* at *2.

[55] *Id.*

[56] *Id.* at *3.

[57] *Id.*

17

prepaing its expert report on Count II.[58]  As noted, the documents were produced before the argument on summary judgment held on August 21, 2020, and the production preceded the December 23, 2020 summary judgment ruling by seven months and preceded the supplemental summary judgment ruling by eighteen months.

Nearly a year-and-a-half after the *2020 S. J. Decision*, SD3 filed a Rule 37 Motion for Sanctions on April 22, 2022 challenging CSG's "late" production of the J&T Documents.[59]  According to SD3, CSG's May 22, 2020 production of the J&T Documents was a discovery violation and warranted a sanction in the form of an order requiring "PwC and EY to re-do their Section 2.4.2 valuations of RETIA to consider the J&T Business Plan, and for EY to further consider CSG's responses to PwC's inquiries."[60]  SD3 also sought fees and costs.

In its May 17, 2022 brief opposing sanctions, CSG argued that there had been no explicit request for the J&T Documents prior to the February 19, 2020 request.[61]  The February 19 request followed the motions to compel that were resolved by agreement, as the parties informed the Superior Court on February 10, 2020.  CSG also asserted that the

---

[58] *2023 Decision*, 2023 WL 3145917, at *5.  SD3 has argued that CSG should have produced the J&T Documents before the court's implied deadline for Count I discovery.  App. to Answering Br. at B4960, Tab 74 (Hearing Transcript on Plaintiff's Motion for Sanctions dated May 23, 2020 [hereinafter "May 2022 Hearing Trans. at _"] at 23:14–17) (arguing that "implicit in a deadline to prepare a report is that the information necessary for that report would be produced and generated, and it wasn't."); *see also* Opening Br. at 23.

[59] App. to Opening Br. at A631 (Rule 37 Motion at 1).

[60] *Id*. at A641 (Rule 37 Motion at 10).

[61] App. to Answering Br. at B4885–86, Tab 72 (Opposition to Plaintiff's Motion for Sanctions [hereinafter "Opp. to Rule 37 Motion at __"] at 1–2).

18

"business plan" was not a "valuation" and was not created as a part of RETIA's budgeting and business planning. As such, the J&T Documents were not within the ambit of any prior request and CSG had not violated any order of the court. Rather, SD3 had filed for summary judgment before the deadline for dispositive motions and then argued against CSG's request to finish Count I discovery on the scheduled timeline. CSG also argued that, in any event, the J&T Documents were not a basis for Qureshi to change the PwC report because the PwC report already considered the MADR contract.

The Superior Court held oral argument on the sanctions motion on May 23, 2020.[62] The court chastised the parties for not accurately describing its prior rulings.[63] The court was specifically referring to the fact that it had not ordered in October and December of 2019 that discovery be completed on Count I.[64] Instead, the court explained that:

> What I did was, in order to get the process going forward so that you could get relief on Count I, is I made sure that you got the ability to have your expert produce the report, which could then be averaged so that we could come up with the independent valuation. And that is what I am talking about in how we represent what happened here.[65]

On June 8, 2022, the Superior Court denied SD3's Motion for Sanctions for Non-Compliance with Discovery Orders ("*2022 Decision*"). The Superior Court did not find cause to grant the relief under Rule 37 in the form of reversing its prior decision. Although the Superior Court denied the motion under Rule 37, it did allow some limited additional

---

[62] *Id*. at B4938–87, Tab 74 (May 2020 Hearing Trans. at 1–50).

[63] *Id*. at B4942, Tab 74 (May 2020 Hearing Trans. at 5:5–8) ("[I]f you are going to represent what I have ruled, please represent it the way it was done and not the way that you think it was done.").

[64] *Id*. at B4958–59, Tab 74 (May 2020 Hearing Trans. at 21–22).

[65] *Id*. at B4959, Tab 74 (May 2020 Hearing Trans. at 22).

discovery in an effort to clarify the nature and purpose of the J&T Documents:

> [I]f SD3 wants to seek relief under Civil Rule 60, SD3 is entitled to a Rule 30(b)(6) deposition of CSG regarding the "J&T Business Plan" (as defined in the Motion) so that SD3 can clarify whether the J&T Business Plan is a document containing a "[Retia]-prepared business plan for the period 2017-2021" or is, to use CSG's characterization, a document created by CSG for J&T Banka for a loan and does not contain a Retia prepared business plan "as part of Retia's contemporaneous budgeting and business planning."[66]

### 6. Rule 60 Opinion on April 23, 2023

After SD3 conducted the permitted discovery, and as suggested by the court, on October 19, 2022, SD3 filed its Rule 60 Motion to Amend the Court's *2020 S. J. Decision*.[67] In support of the motion, SD3 cited to the declaration of Ilona Kadlecová, a CSG representative, who stated that CSG had prepared the J&T Documents, not RETIA.[68] At Ms. Kadlecová's September 6, 2022, deposition, she testified that (a) RETIA representatives, including its then-CFO, a controller, and potentially its then-CEO,

---

[66] *Id*. at B4558, Tab 79 (*2022 Decision*, at 2).

[67] *Id*. at B4615, Tab 84 (Rule 60 Motion to Amend the Court's Count I Decision [hereinafter "Rule 60 Motion at _"]). On October 14, 2022, PwC issued a Second PwC Report calculating the value of RETIA to be 1,562,000,000.00 CZK. *Id*. at B5825, Tab 107 (Order dated July 19, 2023); *see also id.* at B4678–718, Tab 85 (Second PwC Report).

[68] *Id*. at B4622, Tab 84 (Rule 60 Motion at 6 ¶ 10). Ms. Kadlecová was the Chief Financial Officer of CSG. On May 26, 2022, CSG filed a declaration to respond to a question at the Rule 37 hearing regarding "whether the J&T Banka document(s) at issue were created by [RETIA] or using business plans prepared by [RETIA]." *Id*. at B4500, Tab 76 (May 26, 2022 Letter to the Court from Philip Trainer, Jr.). Ms. Kadlecová declared that she requested two employees of a CSG subsidiary to "assist in gathering and providing information to the bank." *Id*. at B4504–05, Tab 77 (Declaration of Ilona Kadlecová [hereinafter "Kadlecová Declaration at _"] at 2–3). She declared that the three of them created spreadsheets, that RETIA did not have a business plan or adequate projections about contracts, and that CSG derived its own estimates and assumptions. *Id*. at B4505–06, Tab 77 (Kadlecová Declaration at 3–4). She also declared that the estimates of profit margins and potential contractual opportunities were "CSG's assessment of best-case scenarios[.]" *Id*. at B4506, Tab 77 (Kadlecová Declaration at 4).

provided CSG with the initial data that made up the J&T Business Plan; and (b) it was important that J&T Banka agreed with the assessment of RETIA's potential as of June 2017.[69] Kadlecová summarized this collaborative creation as "some information came from RETIA, then it was reviewed and adjusted by the group [CSG]. And then it went back to RETIA and then again -- and then only after that it came -- it went to [J&T Banka]."[70] PwC then prepared the Second PwC Report which valued RETIA at 1,526,000,000 CZK.[71]

SD3 argued that the J&T Documents were newly discovered evidence that CSG withheld, disavowed, and failed to provide to its own expert. According to SD3, withholding this document "incorrectly decreased RETIA's value and Penalty Amount for Count I."[72] Thus, SD3 requested that the Court "amend the [*2020 S. J. Decision*] by re-

---

[69] *Id*. at B4623, Tab 84 (Rule 60 Motion at 7 ¶ 12) (citing App. to Opening Br. at A1891–92, A1893, A1894, A1895–96, A1904, A1905, A1906 (Sept. 6, 2022 Ilona Kadlecová Deposition Transcript [hereinafter "Kadlecová Sept. 2022 Depo. Trans. at _"] at 49:13–51:25; 54:2–55:12; 58:2–61:4; 64:20–69:3; 99:19–24; 102:18–8; 108:8–11:9)). Ms. Kadlecová gave three depositions in this case. *See generally*, App. to Opening Br. at A1852–64 (Jan. 29, 2020 Ilona Kadlecová Deposition Transcript); *id*. at A1869–80 (Aug. 9, 2022 Ilona Kadlecová Deposition Transcript ); *id*. at A1889–933 (Kadlecová Sept. 2022 Depo. Trans.). The August 9, 2022 deposition was adjourned because CSG's counsel believed Ms. Kadlecová "need[ed] to make additional efforts to inform herself with respect to the topics necessary to allow the company to respond fully to the topics in your notice." *Id*. at A1879 (Kadlecová Aug. 2022 Depo. Trans. at 34:10–14). The Kadlecová deposition resumed on September 6, 2022. *Id*. at A1889 (Kadlecová Sept. 2022 Depo. Trans. at 47:11–15).

[70] App. to Answering Br. at B4623, Tab 84 (Rule 60 Motion at 7 ¶ 12 (citing App. to Opening Br. at A1907 (Kadlecová Sept. 2022 Depo. Trans. at 111:3–9)).

[71] *Id*. at B4686, Tab 85 (Second PwC Report at 3). It appears from the briefing below and the Second PwC Report, *id*. at B4692, Tab 85 (Second PwC Report at 9), that the parties continued to disagree as to the significance of the J&T Documents and the weight to be given to the MADR contract and the MADR Servicing Project. *Id*. at B4692–93, Tab 85 (Second PwC Report at 9–10). We do not find it necessary to describe further the specific disagreements as to the specific inputs into the respective valuations.

[72] *Id*. at B4625, Tab 84 (Rule 60 Motion at 9 ¶ 18).

calculating the Penalty Amount (without pre-judgment interest) using the average of the valuations reached in the First EY Report and the Second PwC Report at 129,625,000 CZK" and order CSG to pay all of SD3's fees and costs.[73]

On January 18, 2023, CSG filed a brief responding to SD3's Motion to Amend the Court's Count I Summary Judgment. CSG argued that SD3 could have "discovered" the document (which SD3 had in its possession) using due diligence.[74] CSG argued further that the J&T Documents were not withheld from PwC and were specifically turned over in response to the agreement between the parties following resolution and withdrawal of the motions to compel. Moreover, discovery on both counts was ongoing, yet SD3 chose to file for summary judgment before the deadline. As to the nature of the documents, CSG contended that additional discovery showed that the documents were not a RETIA-prepared business plan. Rather, the documents were prepared to allow Technology CS to obtain a loan in connection with the purchase of RETIA. The data was adjusted by CSG and represented "best-case scenarios[.]"[75] In addition, the J&T Documents did not express any probability of project realizations, and Qureshi had used a 100% probability for the MADR contract, which was higher even than the 90% probability from a June 27, 2017 document after the Valuation Date.[76]

The Superior Court issued its opinion on April 27, 2023, denying SD3's Rule 60

---

[73] *Id*. at B4626, Tab 84 (Rule 60 Motion at 10).

[74] *Id*. at B5601, Tab 92 (Opp. to Rule 60 Motion at 2 ¶ 4).

[75] *Id*. at B5606, Tab 92 (Opp. to Rule 60 Motion at 7 ¶ 13).

[76] *Id*. at B5608–09, Tab 92 (Opp. to Rule 60 Motion at 9–10 ¶ 18). *See also id*. at B4522, 4525–28, Tab 77 (June 22 and June 27, 2017 Emails between Rudolf Bureš and Pavel Havlíček).

Motion (the "*2023 Decision*").[77]  The court first addressed the question that the limited discovery (ordered after the Rule 37 hearing) was intended to answer, namely, whether the J&T Documents contained a RETIA-prepared business plan for 2017–2021, or whether they were created by CSG for J&T Banka for purposes of a loan.  In summarizing its review of the discovery taken, including the Kadlecová depositions, the court determined that the documents fell somewhere in the middle:

> [T]he J&T Business plan falls somewhere between how it is characterized by SD3 or CSG.  The J&T Business Plan clearly contains financial information regarding RETIA; however, the J&T Business Plan does not appear to be "RETIA-prepared business plan for the period 2017–2021."[78]

Nevertheless, it found that SD3 could not satisfy either Rule 60(b)(2) or Rule 60(b)(6).

The court determined that Rule 60(b)(2) did not apply because the J&T Documents were not newly discovered evidence and that "[t]he answer here lies in the undisputed timeline."[79]  SD3 was "unable to show that it could not, in the exercise of reasonable due diligence, have discovered the J&T Business Plan before the Court issued the Decision and the Supplemental Decision."[80]  Further, SD3 could not satisfy the more exacting Rule 60(b)(6) standard because SD3 failed to show "extraordinary circumstances."[81]  SD3 had the J&T Documents in May 2020 and failed to identify them as relevant.[82]

---

[77] *2023 Decision*, 2023 WL 3145917, at *1.

[78] *Id.* at *3.

[79] *Id.* at *5.

[80] *Id*.

[81] *Id*. at *6.

[82] *Id*.

### 7. *The Conversion Rate and Date Issue*

SD3 submitted a proposed form of final judgment and order on May 23, 2023.[83] Its proposed order requested a Penalty Amount of 56,875,000.00 CZK and 22,760,128.42 CZK in pre-judgment interest.[84] The total requested amount was 79,635,128.42 CZK, plus post-judgment interest to accrue at 10.25% per annum.[85] CSG filed a response objecting to SD3's proposed interest calculations and interest rate.[86] SD3 then submitted a revised form of order. There was more back and forth over the interest issues. SD3 submitted a revised form of order on July 18, 2023 with a judgment date of July 18, 2023.[87]

On July 19, 2023, the Superior Court emailed the parties stating that, "[o]ur case manager says that judgments must be in USD and not CZK. The order needs to have 'a conversion identified' on the order, *i.e., somewhere in the judgment it has to be in USD.* Please submit an order with USD."[88] On July 20, 2023, SD3 submitted the proposed order and stated in the accompanying email:

> As explained in the footnote in the form, SD3 used the most recent exchange rate published by the U.S. government through the Treasury Reporting Rates of Exchange as of the date of the Order. SD3 believes that execution of the judgment was only ripe as of yesterday, and the value of the judgment should be calculated using yesterday's published conversion rate. SD3 has not found any case law on point. Yesterday's rate, however, is the logical choice. CSG neglected to make payment on June 20, 2017. While pre-

---

[83] App. to Opening Br. at A2487 (May 23, 2023 Final Judgment and Order).

[84] *Id*. at A2490–91 (May 23, 2023 Final Judgment and Order).

[85] *Id*. at A2491 (May 23, 2023 Final Judgment and Order).

[86] *See* App. to Answering Br. at B5814, Tab 105 (Order dated July 17, 2023).

[87] *Id*. at B5820, Tab 106.

[88] App. to Opening Br. at A2506 (July 19, 2023 Email from the Court to the Parties) (emphasis added).

judgment interest protected SD3 between June 20, 2017 and yesterday, an exchange rate is a neutral figure for shifting value on parties and reflects current markets as of the date of a judgment. Accordingly, because SD3 had no judgment to execute until yesterday, SD3 maintains that it has used the correct conversion rate in the attached form of Order.[89]

SD3's Proposed Final Judgment accompanying this email stated:

IT IS HEREBY ORDERED, that judgment on Count I shall be entered in favor of SD3 and against CSG in the amount of 56,875,000.00 CZK (Penalty Amount) and 23,339,396.40 CZK (in pre-judgment interest) for a total judgment in the amount of 80,214,396.40 CZK, equivalent to 3,775,683.52 U.S. Dollars as of the date of this Order[.][90]

CSG submitted a letter to the court in response, requesting the exchange rate be set as of the June 20, 2017 Valuation Date.[91] CSG argued that SD3's suggested date would result in SD3 receiving a windfall of approximately $375,000:

The Penalty Amount in [SD3's] original form of Final Order and Judgment is simply a reflection of that determined value, as of that date, and there is no logical reason why that value – determined in Czech crowns – should be converted as of the date of judgment, a date the 6th Circuit Court of Appeals recognized as "arbitrary."[92]

On August 23, 2023, the Superior Court entered judgment with a handwritten addition on the bottom of CSG's letter:

So Ordered that the conversion rate at time of valuation, June 20, 2017, is the applicable rate. That rate plus pre- and post-judgment interest protects the expectations of the parties. This decision relies upon the reasoning in Ventas, Inc. v. HCP, Inc., 647 F.3d 291, 323 (6th Cir. 2011) (apply Restatement 3rd

---

[89] *Id.* at A2505 (July 20, 2023 Email from SD3 to the Court).

[90] *Id.* at A2513 (July 20, 2023 Proposed Final Judgment). The parties are not challenging the interest amounts.

[91] App. to Answering Br. at B5843, Tab 110 (July 20, 2023 Letter from CSG to the Court).

[92] *Id.* at B5845, Tab 110 (July 20, 2023 Letter from CSG to the Court) (citing *Ventas, Inc. v. HCP, Inc.*, 647 F.3d 291, 323 (6th Cir. 2011)).

Foreign Judgments and Kentucky law).  Plaintiff to submit new order.[93]

The final order and judgment reflecting this request was ordered on September 5, 2023, "in favor of SD3 and against CSG in the amount of 56,875,000.00 CZK (Penalty Amount), equivalent to 2,388,750.00 U.S. Dollars, and $998,808.36 (in pre-judgment interest) for a total judgment in the amount of $3,387,558.36[.]"[94]  The court added a footnote to its reference to "U.S. Dollars," stating that "[p]er the Court's Order dated August 23, 2023 (Trans. ID 70700242), the Treasury Reporting Rates of Exchange applied to this Order is 1.00 U.S. Dollar = 23.601 Czech Republic-Koruna as of June 20, 2017."[95]  The court also ordered post-judgment interest.

### III.    ANALYSIS

#### A.  Whether the Superior Court Erred by Granting Summary Judgment

##### 1.  Contentions on Cross-Appeal

We take up the cross-appeal issues first as they relate to issues arising earlier in the chronology than the issues raised on direct appeal.  In its cross-appeal, CSG challenges numerous aspects of the *2020 S. J. Decision* and *2021 Supplemental Decision*.  It argues that the court erred in granting summary judgment based on PwC's expert's report without permitting expert discovery or rebuttal testimony.  CSG also contends that the court erred in treating Section 2.4.1 of the Agreement as an arbitration or exclusive remedy provision even though Section 7 of the Agreement confers jurisdiction on the Delaware courts to

---

[93] *Id.* at B5874, Tab 113 (CSG Letter So Ordered on August 23, 2023).

[94] Opening Br. Ex. F Revised Final Judgment and Order at 5.

[95] *Id*.

26

settle any disputes arising out of or in connection with the Agreement. Further, according to CSG, the court erred by ignoring the language of the Agreement requiring an independent valuation and in finding that as a result of asserting a general objection for the purpose of preserving a potential position early in the case, CSG was judicially estopped from challenging the valuation reports.

### 2. The Superior Court's Contractual Interpretation is Correct

We first consider CSG's contentions that the Superior Court misconstrued Sections 2.4.2 and 7 of the Agreement and erred by precluding discovery into the methodology underlying the parties' valuations. This Court reviews the Superior Court's summary judgment decisions and contractual interpretation *de novo*.[96]

We hold that the Superior Court did not err in determining that Sections 2.4.1 and 2.4.2 are clear and unambiguous and that they do not reasonably contemplate an inquiry into the substance of the methodology underlying each side's valuations. The Independent Valuation is defined as the "valuation of the Company as agreed upon by the Grantor and the Grantee in writing on a date no later than 14 days following the initial notice of the Grantor to the Grantee of the change in control."[97] If there is no agreement within fourteen days of the notice, "*each of the Grantor and the Grantee shall hire a Big Four accounting firm*, and *the Independent Valuation of the Company shall equal the average of the two*

---

[96] *Ferrellgas Partners L.P. v. Zurich Am. Ins. Co.*, 2024 WL 2885282, at *11 (Del. June 10, 2024) (citing *In re Solera Ins. Coverage Appeals*, 240 A.3d 1121, 1130 (Del. 2020)); *Holifield v. XRI Inv. Holdings LLC*, 304 A.3d 896, 921 (Del. 2023) (citing *CompoSecure, L.L.C. v. CardUX, LLC*, 206 A.3d 807, 816 (Del. 2018)).

[97] App. to Answering Br. at B111, Tab 2 (Agreement § 2.4.2).

*valuations.*"[98]

The court correctly interpreted and applied this straightforward provision when it ruled that "Section 2.4.2 anticipates that the valuations from two Big Four accounting firms may be different," and that "[i]nstead of calling for discovery and disputes, Section 2.4.2 provides that the Independent Valuation of the Company shall be the average of the two valuations."[99] The parties chose a simple method, where two reputable accounting firms each conducted an expert determination of the valuation which were then averaged and put into the contractually agreed upon Penalty Amount formula.

Section 7 does not undercut the conclusion that Sections 2.4.1 and 2.4.2 are clear and unambiguous. Section 7 states:

> Governing Law. This Agreement and all disputes or controversies arising out of or relating to this Agreement or the transactions contemplated hereby shall be governed by, and construed in accordance with, the internal laws of the State of Delaware, without regard to the laws of any other jurisdiction that might be applied because of the conflicts of laws principles of the State of Delaware. Each of the Parties to this Agreement irrevocably agrees that the courts of the state of Delaware shall have jurisdiction to hear and decide any legal proceeding, and to settle any disputes, which may arise out of or in connection with this Agreement or its formation or validity and, for these purposes, each party irrevocably submits to the jurisdiction of the courts of the state of Delaware.[100]

Here, the Superior Court did address the dispute submitted to it.

The Superior Court's resolution of the challenged provisions and the scope of inquiry into the determination of the Independent Valuation is consistent with our Delaware

---

[98] *Id.* (emphasis added).

[99] *2020 S. J. Decision*, 2020 WL 12719975, at *11.

[100] App. to Answering Br. at B112, Tab 2 (Agreement § 7).

case law.  Most notably, in an insightful analysis in *Senior Housing Capital, LLC v. SHP Housing Fund, LLC*,[101] the Court of Chancery recognized a number of different contractual positions that parties might adopt regarding judicial review of a contractual valuation methodology set forth in an LLC Agreement.  First, the parties could bargain for a *de novo* judicial determination of the value if the parties cannot agree.  In other words, the parties "can omit any kind of appraisal provision from the contract and simply provide that one input to the formula is fair market value, and implicitly leave this court to resolve the dispute, because the contract provides no other method to resolve any disagreement."[102]

Second, the parties could have the value determined by an expert, such as an investment bank or accounting firm, and designate that expert as an arbitrator for that purpose.[103]  A court would have only narrow grounds to set aside an arbitrator's judgment, consistent with the limited form of judicial review available under the Federal Arbitration Act.[104]

Third, the parties could agree to use an appraiser to determine the value to be used as an input into a payout formula, and to have the value that will be used as a contractual input decided definitively and without substantive review by a contractually designated

---

[101] 2013 WL 1955012, at *24–27 (Del. Ch. May 13, 2013).

[102] *Id*. at *24.  Alternatively, "the parties can expressly state in the contract that this court is to resolve any dispute over valuation of the property."  *Id*.

[103] *Id*.

[104] Under this type of review, the court does not examine whether the arbitrator's legal judgments were correct or whether its factual determinations were supported by substantial evidence.  Instead, "an arbitrator's ruling can only be set aside on very narrow grounds, and the reviewing court does not have the same leeway to set aside an arbitrator's judgment as it would to set aside that of a trial court."  *Id*.

party. In such a case, there is no judicial review "*if no provision for such review is provided in the contract itself.*"[105] A court may review whether the parties faithfully applied the formula, but it may not substantively review the appraiser's determination of the value that the contract requires be used as an input into the formula.[106] Such a substantive review would rewrite the contractually defined input and replace it "with a term supplied by judicial fiat and involving the appraiser's result just being a starting point for a *de novo* judicial inquiry into value."[107]

The parties might also choose to contract for the right to dispute an appraiser's valuation through providing for additional appraisals if a party disagrees with the result. This is not an arbitration, like the Chancellor's second option, although it requires the parties to be in dispute over the initial appraised value. The Court of Chancery, in *Senior Housing Capital, LLC*, considered the provision at issue to be of this type.[108] This type of agreement should be treated in the same way as a process that contractually provides for a

---

[105] *Id*. at *25 (emphasis in original).

[106] *Id*.

[107] *Id*.

[108] The Chancellor described the formula at issue in *Senior Housing Capital* as follows:

> [A] party had the right to object to an appraised value, when the appraisal was carried out at the end of a contract period. That party could then pay for another appraisal to be carried out by an appraiser from CalPERS' approved list. If the first and second appraisals were within 5% of each other, the values were averaged; otherwise, the first two appraisers were to select a third appraiser, again from CalPERS' list, to value the Projects. The final value was the average of the appraisals that were within 5% of the middle appraisal, or the middle appraisal alone, if that was all that was left.

*Id*.; *id.* at * 26 ("On this gradation of contractual choice, this third scenario is the one that the parties under the LLC Agreement chose.").

30

single appraisal without one party having to dispute it as "the contract does not contemplate any judicial review, because the iterative contractual process itself provides a definitive resolution."[109]  In *Senior Housing*, the Court of Chancery held that the parties chose the third type of contract as the parties had bargained for appraisers to determine the value of the appraisals which served as inputs to the formula to determine the incentive distribution at issue.[110]

Accordingly, the Chancellor rejected the request that the court reach a *de novo* determination of value.  Instead, the Chancellor held:

> Where, as here, (i) a contract written by one party (ii) says that that party will make a payment based on a formula, (iii) the formula says that an input into the formula will be determined by an appraiser, and (iv) the party making the payment gets the contractual right to select the appraiser, the parties have clearly agreed to be bound by that appraiser's professional judgment. Unless the party unhappy with the appraiser's judgment can show that the appraised market value resulted from a concerted course of bad faith action between the appraiser and the other party—*i.e.*, a breach of contract by a party—or that the appraiser's result was otherwise tainted by the contractually improper conduct of the other party (such as intentionally providing the appraiser with false information to taint the valuation), the parties are stuck with what they bargained for.  The lack of room for law-trained judicial second-guessing makes sense because such unschooled second-guessing undercuts the parties' choice to have an expert on the relevant property type perform the task.[111]

---

[109] *Id.* at *25.

[110] *Id.*

[111] *Id*. at *3.  As our Court observed in *Terrell v. Kiromic Biopharma, Inc*., 297 A.3d 610, 621 (Del. 2023), critical to the Court of Chancery's decision in *Senior Housing Capital* to eschew a more rigorous standard of review "was that the appraiser was tasked with determining a narrow issue of fact within its field of expertise—an expertise not shared by the court." *Id*.  The provision at issue in *Terrell* was also an expert determination, as opposed to an arbitrator's determination; however, it required a dispute resolution committee to reach legal determinations rather than issue findings of fact within its area of expertise.  Therefore, we held that the Court of Chancery was not required to defer to the Committee's conclusions.  *Id*. at 623.

*De novo* review would have been inconsistent with "the most central rule of contract interpretation," namely, that "a contract must be interpreted in accordance with its plain terms as they would normally be understood."[112] Accordingly, the Chancellor declined the request to address valuation questions "and substitute his judgment in place of the contractually designated authority to set that contractual input."[113]

However, the Court of Chancery found that it could consider "a claim that the integrity of the contractual appraisal process was compromised by the wrongdoing of one of the parties."[114] It determined that it "may only modify the appraisers' determinations of Fair Market Value if one party can show that there has been a breach of the implied covenant of good faith and fair dealing."[115]

Here, as in *Senior Housing Capital*, the parties bargained for and agreed to a method akin to the third option. SD3 and CSG bargained and agreed that each would use an appraiser from a Big Four accounting firm to determine the value of 100% of RETIA's shares. The parties bargained and agreed to the inputs, the two valuations, and the formula, which would average the two valuations to determine the Independent Valuation. The Superior Court did not err by rejecting CSG's arguments that the court could evaluate the PwC's methodology or input numbers.[116]

---

[112] *Id.*

[113] *Id.* at *26.

[114] *Id.* at *27.

[115] *Id.* at *39.

[116] The Superior Court observed that CSG's position taken in certain discovery requests was consistent with the Superior Court's construction of the provisions. *2020 S. J. Decision*, 2020 WL 12719975, at *11 (citing General Objection B). Although we need not and do not reach the judicial

Nor did the Superior Court err in permitting CSG the opportunity to conduct further discovery into whether there was a basis for a good faith and fair dealing claim. The limited review is consistent with that exercised by the Court of Chancery in *Senior Housing Capital*.

This leads us to CSG's next challenge which is that the Superior Court erred in relying on a declaration by Qureshi submitted for the first time with SD3's reply brief.[117] CSG argues that a motion for summary judgment cannot be supported by purported evidence introduced for the first time with the reply brief. SD3 responds to this argument only in a footnote, calling this issue "inconsequential" because the Superior Court deferred its summary judgment decision as to PwC's independence, allowing CSG to take certain discovery, including deposing Qureshi, after which the parties submitted supplemental briefing.

"'[A] party opposing summary judgment may, pursuant to . . . Rule 56(f), request limited discovery if it cannot present facts essential to oppose the summary judgment motion.'"[118] Rule 56(f) is discretionary, and should be considered under an abuse of

---

estoppel issue, CSG's initial position that the valuation could not be challenged aligns with the Superior Court's holding that the plain language of the Agreement did not contemplate judicial inquiry into the parties' valuation methodologies.

[117] Answering Br. at 51–53.

[118] *Options Clearing Corp. v. U.S. Specialty Ins. Co.*, 2021 WL 5577251, at *9 (Del. Super. Ct. Nov. 30, 2021) (quoting *Aveanna Healthcare, LLC v. Epic/Freedom, LLC*, 2021 WL 3235739, at *28 (Del. Super. Ct. July 29, 2021)). Rule 56(f) provides:

> **(f) When Affidavits Are Unavailable.** Should it appear from the affidavits of a party opposing the motion that the party cannot for reasons stated present by affidavit facts essential to justify the party's opposition, the Court may refuse the application for judgment or may order a continuance to permit affidavits to be obtained or depositions to be taken or discovery to be had or make such other order

discretion standard of review.[119]   The Superior Court properly permitted CSG to take

limited discovery to see if there was a basis to CSG's contentions that SD3 did not act with

good faith or fair dealing.[120]

When CSG failed to uncover evidence that would support such a claim, the Superior

Court properly found no breach of good faith and fair dealing.   The Superior Court

considered briefing and reviewed "the Supplements, including the entire deposition

transcript of Mr. Qureshi.  The Court also re-examined the record provided in support of

the Motion."[121]  The record before the court was extensive, and the Superior Court did not

err by considering, relying upon, or quoting the Qureshi declaration in addition to the other

record evidence.  There was no abuse of discretion when the Superior Court ultimately

concluded that "the record fails to support a conclusion that PwC was improperly

influenced by SD3, its agents, or its litigation counsel in arriving at the valuation in the

---

as is just.

Del. Super. Ct. Civ. R. 56(f).

[119] *Options Clearing Corp.*, 2021 WL 5577251, at *9 (citing Del. Super. Ct. Civ. R. 56(f)); *see also Primestone Inv. Partners L.P. v. Vornado PS, L.L.C.*, 822 A.2d 397, 2003 WL 1904666, at *1 (Del. Apr. 16, 2003) (TABLE) (reviewing a Court of Chancery Rule 56(f) decision under abuse of discretion).

[120] *2020 S.J. Decision*, 2020 WL 12719975, at *13 ("The Court finds these statements to be strong indicators of the independence of Mr. Qureshi and PwC.  The Court has no reason to believe that Mr. Qureshi would make improper declarations or sacrifice the reputation of PwC over this litigation."); *id*. ("However, the Court notes that some of these declarations are inconsistent with the PwC Retainer Agreement provisions.  As such, the Court will allow CSG to test these inconsistencies in discovery.").

[121] *2021 Supplemental Decision*, 2021 WL 5710897, at *1.  SD3's Supplemental Submission regarding the Independence of PwC was over 300 pages.  App. to Answering Br. at B3552–882, Tab 61 (MSJ Supp. Br.).  CSG submitted over 900 pages.  *Id*. at B3883–B4821, Tab 62 (Supp. Opp. to MSJ).

PwC Report."[122] The court then supplemented its *2020 S. J. Decision* and determined there was no improper SD3 influence on the PwC Report's valuation and that Qureshi had independently evaluated RETIA. Accordingly, there was no error either in the court's finding of no breach of the duty of good faith and fair dealing or in the process by which the court made that determination.[123]

In conclusion, summary judgment was appropriate, and CSG failed to demonstrate to the Superior Court that further discovery was required. The Superior Court's role in determining the Independent Valuation was to apply the mathematical formula agreed to by the parties in Sections 2.4.1 and 2.4.2. The court fairly allowed for discovery limited to good faith and fair dealing issues. When CSG did not present anything to indicate that its claims were at all substantiated, the Superior Court properly granted judgment in favor of SD3.

### B. Issues on Direct Appeal

Now we turn to SD3's appeal, concerning the Rule 37 and 60 decisions and the

---

[122] *2021 Supplemental Decision*, 2021 WL 5710897, at *1.

[123] *Id.* at *1. CSG challenges the Superior Court's conclusions that "Section 2.4.2 does not anticipate 'independent' valuations by the two Big Four accounting firms." *2020 S. J. Decision*, 2020 WL 12719975, at *11; App. to Answering Br. at B3802, Tab 61 (Aug. 2020 Hearing Trans. at 9:12–21); Answering Br. at 11–12. Black's Law Dictionary defines "independent" as "[n]ot subject to the control or influence of another." Black's Law Dictionary, "INDEPENDENT," (12th ed. 2024). We think the Agreement likely contemplated that the two Big Four opinions would be independent. But we need not resolve this issue because the Superior Court ultimately agreed that PwC's work was independent after considering the additional discovery concerning the independence of the PwC report. In its *2021 Supplemental Decision*, after discovery, the court noted, "Mr. Qureshi testified that SD3 did not influence the PwC Report's valuation. The record shows that Mr. Qureshi did independently evaluate RETIA." *2021 Supplemental Decision*, 2021 WL 5710897, at *3.

statutory currency issues.

### 1. Whether the Superior Court Erred by Denying Relief Under Rule 37

#### a. No Court Orders Were Violated

SD3 challenges the Superior Court's *2022 Decision* as a misapprehension of its authority to address CSG's intentional failure to disclose the J&T Documents. SD3 says the trial court refused to consider the relief requested under the standards applicable to SD3's Rule 37 motion and instead suggested that a motion under Rule 60 would be more appropriate. The problem, SD3 argues, is that Rule 60 applies only to final orders and the Count I summary judgment orders were non-final, interlocutory orders. Further, the court had full discretion pursuant to Rule 54(b), and its inherent powers, to revise, amend, or modify the *2020 S. J.* and *2021 Supplemental Decisions* at any time before entry of final judgment. SD3 asks us to remand so the Superior Court can "consider SD3's procedurally proper motion under the correct legal standard."[124]

CSG's responds that it did not violate any existing order that could be remedied by Rule 37 sanctions, and that the Superior Court was correct to instruct SD3 that it was entitled to seek relief under Rule 60, if it so chose. CSG does not respond to SD3's claim that the *2020 S. J.* and *2021 Supplemental Decisions* were not final.

The Superior Court has broad discretion regarding whether or not to impose discovery sanctions under Rule 37. Thus, we "will not disturb a trial [judge]'s decision regarding sanctions imposed for discovery violations absent an abuse of discretion."[125] We

---

[124] Opening Br. at 4.

[125] *Lehman Cap. v. Lofland ex rel. Est. of Monroe*, 906 A.2d 122, 131 (Del. 2006) (alteration in

review *de novo* the Superior Court's formulation and application of legal principles.[126]

We find no abuse of discretion with the trial court's refusal to award Rule 37 sanctions. Superior Court Civil Rule 37(b) governs a party's failure to comply with an order to provide discovery.[127] SD3 does not point to an order that CSG disobeyed.[128] At oral argument before this Court, SD3 only pointed to the October and December 2019 hearings.[129] However, SD3 has not convinced us that CSG violated these orders.

The October 28, 2019 hearing addressed SD3's Motion To Vacate Confidentiality Designations.[130] In granting the motion, the Superior Court stated:

> [T]his is the next thing that's going to happen is, you have to provide this to PriceWaterhouseCoopers, and *anything that PriceWaterhouseCoopers says they need to do their 2.4.2 valuation, you have to give them.*
>
> Now, it can be designated highly confidential in the interim, okay, because that's what was contemplated by the parties, but I need the 2.4.2 valuation by PriceWaterhouse, and *we're not going to block them as to how to do that.*
>
> Now, we're going to put a time frame on when PriceWaterhouseCoopers is going to do this, because this litigation has been going on for a while, and it doesn't take PriceWaterhouseCoopers years to produce a 2.4.2 report, all right. So they better get their act together, and you better make sure they get

---

original) (quoting *In re Rinehardt*, 575 A.2d 1079, 1082 (Del. 1990)).

[126] *Gannett Co. v. Bd. of Managers of the Del. Crim. Just. Info. Sys.*, 840 A.2d 1232, 1239 (Del. 2003).

[127] Del. Super. Ct. Civ. R. 37(b).

[128] *See* Del. Super. Ct. Civ. R. 37(b) (outlining sanctions when a party "*fails to obey an order to provide or permit discovery, including an order made under subdivision (a) of this Rule* or Rule 35[.]") (emphasis added).

[129] In its Rule 37 Motion filed in April 2022, SD3 argued that CSG's failure to produce the J&T Documents "violated the Court's October 2019 Order and the Court's December 2019 Order." App. to Opening Br. at A640 (Rule 37 Motion at 9).

[130] App. to Answering Br. at B669–732, Tab 24 (Oct. 2019 Hearing Trans.); *id*. at B378–84, Tab 14 (Motion to Vacate Confidentiality Designations).

their act together because PriceWaterhouseCoopers is going to do a 2.4.2 report. *And it's not going to be blocked by RETIA, and it's not going to be blocked by CSG, and it's not going to be blocked by Ernst & Young*.[131]

The court did not order discovery to be completed on Count I as the transcript reveals — a point the court would firmly clarify at the later hearing held on May 23, 2022.[132] Instead, it required CSG to remove the "highly confidential" designation from the EY Report and improve its cooperation with SD3 and PwC so that PwC could commence work on its valuation report. The court did order the PwC Report to be completed on or before January 17, 2020.[133]

Following that hearing, on November 14, 2019, SD3's counsel sent CSG's counsel its first formal request — a list of questions and requested information from PwC to RETIA.[134] One of those requests was for the "latest Business plan and financial projections of the Company for the next 3 to 5 years[.]"[135] PwC also requested a list of RETIA's potential contracts, identifying MADR on its list of possible tenders:

---

[131] *Id*. at B708–09, Tab 24 (Oct. 2019 Hearing Trans. at 40:15–41:11) (emphasis added).

[132] *See id*. at B4959, Tab 74 (May 2022 Hearing Trans. at 22:13–20).

[133] *Id*. at B711, Tab 24 (Oct. 2019 Hearing Trans. at 43:12–13).

[134] App. to Opening Br. at A317–21 (SD3's Request for Information).

[135] *Id*. at A320 (SD3's Request for Information at 3). CSG originally provided EY with a "Business plan" so that it could conduct the valuation of RETIA. App. to Answering Br. at B3209, Tab 45 (PwC Report at 11 ("The Business plan of RETIA for 2017 – 2021 was provided to me as part of the supporting documents to the EY report. The Business plan was originally provided to EY by CSGM.")). The November 14, 2019 request to RETIA requested the "latest Business plan" which was "prepared during [RETIA's] standard forecasting process." App. to Opening Br. at A320 (SD3's Request for Information at 3). RETIA later explained that the information provided to EY was "not a business plan [] created at RETIA," that "**Budgets / business plans are not available.** RETIA did not prepare them. RETIA was not included in the CSG Group until 2016[,]" and that "if the budget was not prepared as at the valuation date, there were no budgets for earlier years." App. to Answering Br. at B5224–25, Tab 85 (RETIA Responses to PwC Request for Clarification).

38

30. Potential contracts – based on publicly available information, we identified a list of tenders that are not considered in the pipeline of forecasted revenues in the business plan or might not be considered in full. These are listed in the table below. While there is some information about the value of those opportunities/contracts, the share of Retia is mostly unknown. Please provide a full list of opportunities including expected revenues and probability of wining [sic] as at the Valuation date and indicate those, which are included in the above-mentioned business plan, file ref. number CSG-000077.[136]

SD3 asked CSG to provide this information by early December 2019. PwC and CSG discussed the November 2019 requests by phone on December 19 and 20, 2019.[137] After two phone discussions, PwC sent an updated information request on December 23, 2019.[138] CSG, however, did not respond by SD3's requested deadline.

On December 20, 2019, the court held a teleconference regarding the parties' continued difficulties exchanging information. At the teleconference, the court explained how the valuation process had been complicated by the litigation:

*And my ruling back then was, this is the orderly process that needed to be done and it's got to be done* -- it should have been done without litigation because it was a contractual right that both parties agreed to, but that it was going to be necessary to the litigation. I went and read the decision, and I said it's a part of the contract that's necessary given the issues that are raised in the lawsuit.[139]

The court then granted a 45-day extension to March 3, 2020, for PwC to complete its

---

[136] App. to Opening Br. at A321 (SD3's Request for Information at 4).

[137] *2020 S. J. Decision*, 2020 WL 12719975, at *5, n.46.

[138] *Id*.

[139] App. to Answering Br. at B755–56, Tab 27 (Dec. 2019 Conf. Trans. at 9:18–10:22) (emphasis added).

report.[140]

After this teleconference, PwC began obtaining answers to questions from CSG's principals concerning the EY Report. PwC made repeated requests of CSG and RETIA for financial information needed for the valuation effort. On January 9, 2020, PwC received the first batch of requested RETIA documents.[141] Upon review of the January 9 documents, PwC sent additional requests on January 16, 2020.[142] RETIA sent the requested documents on February 5, 2020.[143] Ultimately, the court granted another short extension allowing PwC to complete its report on or before March 10, 2022.[144]

When CSG responded to SD3's requests on January 9, 2020,[145] it disavowed the existence of a CSG-created RETIA "business plan" stating:

> In the introduction to the questions, you summarize our answers and mention that on January 9, 2020 we stated that the 3-years [sic] business plan had been prepared at RETIA and it had been approved by Mr Tichy [sic]. It seems that you translated or interpreted our answers incorrectly. It has been explained that the file reference number CSG-000077 is not a business plan [] created at RETIA, but it is a compilation of data obtained from RETIA[.][146]

---

[140] *Id*. at B765, Tab 27 (Dec. 2019 Conf. Trans. at 19:17).

[141] *2020 S.J. Decision*, 2020 WL 12719975, at *5, n.46.

[142] App. to Answering Br. at B5219–22, Tab 85 (PwC Request for Clarification on January 16, 2020); *see also 2020 S. J. Decision*, 2020 WL 12719975, at *5, n.46.

[143] App. to Answering Br. at B1010, Tab 34 (So Ordered March 2, 2020, Joint Letter to Extend PwC Report Due Date at 2); *id*. at B5224–27, Tab 85 (RETIA responses to PwC Request for Clarification).

[144] This was requested by SD3 on February 25, 2020. *Id*. at B1009–10, Tab 34 (So Ordered March 2, 2020, Joint Letter to Extend PwC Report Due Date at 1–2).

[145] *Id.* at B5224–27, Tab 85 (RETIA responses to PwC Request for Clarification).

[146] *Id.* at B5224, Tab 85. RETIA characterized the information provided to EY as "not a business plan [] created at RETIA," but a "compilation of data obtained from RETIA" that was "approved by" the then current sales manager of RETIA. *Id.* at B5224 (RETIA responses to PwC Request for Clarification). PwC referred to this information as a "Business plan." *Id.* at 3199 (PwC Report

On January 8, 2020, SD3 filed a Motion to Compel Discovery.[147]  On January 10, 2020, CSG filed a Motion to Compel Discovery.[148]  The parties resolved their cross-motions to compel on February 10, 2020.  Then, in an email sent from SD3 to CSG on February 19, 2020, SD3 specifically requested "[c]ommunications with J&T Banka or Commerzbank regarding financing for CSG or RETIA, including the financing of Michal Strnad's purchase of RETIA from CSG, including the current loan agreement, the application to obtain financing, and the decision to provide financing."[149]

CSG responded to SD3's February 19 request on May 22, 2020 with a production of over 12,000 relevant documents.  This production included the J&T Documents.  SD3, however, had issued the PwC Report on March 10, 2020 and then moved for partial summary judgment with respect to Count I of the claim on March 30, 2020, before CSG responded to SD3's additional February 19 requests.[150]  At the time of SD3's March 30, 2020 motion, the operative deadline for discovery was June 19, 2020.[151]

In summary, SD3 first *specifically* requested the J&T Documents from CSG on February 19, 2020, as part of the parties' resolution to their cross-motions to compel discovery.  Had SD3 reviewed the documents it had specifically requested from CSG

---

at 1 ("I based my valuation on information in the EY report and in the supporting documents to the EY report, primarily the Business plan[.]").

[147] App. to Opening Br. at A57 (Superior Court Record).

[148] *Id.* at A56 (Superior Court Record).

[149] App. to Answering Br. at B5582, Tab 88 (Feb. 19, 2019 Email Requests from SD3 to CSG).

[150] App. to Opening Br. at A49 (Superior Court Record).

[151] *Id.* at A445 (Feb. 11, 2020 Case Management Order at 2 ¶ 2).

before moving for partial summary judgment, it could have discovered the J&T Documents. The Superior Court did not, at the October or December hearings, order production to be completed on Count I. There was no order closing discovery on Count I, and the discovery deadline had been extended.[152] Therefore, there was no error or abuse of discretion when the Superior Court held that there was no cause to grant the Rule 37 relief sought and that "the record is not clear that a discovery violation, if any, would warrant the type of relief sought[.]"[153]

### 2. *The Superior Court Did Not Err by Denying Relief Under Rule 60*

Superior Court Rule 60(b) provides relief from a final judgment or order. The standard of review of the Superior Court's denial of a motion to reopen judgment under Rule 60(b) is abuse of discretion.[154]

SD3 sought relief under Rule 60(b)(2) and Rule 60(b)(6).[155] "Because of the significant interest in preserving the finality of judgments, Rule 60(b) motions are not to

---

[152] App. to Answering Br. at B5603, Tab 92 (Opp. to Rule 60 Motion at 3–4 ¶¶ 6–7 (citing *id.* at B1004–05, Tab 33 (Feb. 11, 2020 Case Management Order at 2–3 ¶¶ 2, 4); *id.* at B4860, Tab 68 (Dec. 6, 2021 Case Management Order at 3 ¶ 2))).

[153] *Id.* at B4557, Tab 79 (*2022 Decision*, at 1).

[154] *Albu Trading, Inc. v. Allen Fam. Foods, Inc.*, 822 A.2d 396, 2002 WL 31681803, at *1 (Del. Nov. 22, 2002) (TABLE).

[155] Opening Br. at 25, 29. Rule 60(b) provides in relevant part:

> (b) Mistake; inadvertence; excusable neglect; newly discovered evidence; fraud, etc. -- On motion and upon such terms as are just, the Court may relieve a party or a party's legal representative from a final judgment, order, or proceeding for the following reasons: . . . (2) newly discovered evidence which by due diligence could not have been discovered in time to move for a new trial under Rule 59(b);    . . . or (6) any other reason justifying relief from the operation of the judgment.

Del. Super. Ct. Civ. R. 60(b).

be taken lightly or easily granted."[156]   The question is whether the J&T Documents constituted "newly discovered evidence" within the meaning of Rule 60(b)(2).  For the document to qualify as "newly discovered evidence," the document must have been "in existence and hidden at the time of judgment[.]"[157]

Because the J&T Documents were in SD3's possession seven months before issuance of the *2020 S. J. Decision*, they were not newly discovered.[158]  Had SD3's counsel exercised due diligence upon receiving the May 2020 production of documents, it would have discovered the J&T Documents.  SD3 had ample time to present the document to the court before it issued its *2020 S. J. Decision*.  SD3 says the so called "two-track nature" of discovery should weigh in its favor.  But that contention is not consistent with the Case Management Orders or with the October and December 2019 hearing transcripts.[159]  Nor is it consistent with the court's own recollection of what it had ordered during those

---

[156] *Senu-Oke v. Broomall Condo., Inc.*, 77 A.3d 272, 2013 WL 5232192, at *1 (Del. Sept. 16, 2013) (TABLE) (quoting *Wilson v. Montague*, 19 A.3d 302, 2011 WL 1661561, at *2 (Del. May 3, 2011) (TABLE)).

[157] *Bachtle v. Bachtle*, 494 A.2d 1253, 1255–56 (Del. 1985) (quoting *Ryan v. U.S. Lines Co.*, 303 F.2d 430, 434 (2d Cir. 1962)).

[158] For examples under the federal parallel to Del. Super Ct. Civ. R. 60, *see Lightfoot v. District of Columbia*, 555 F. Supp. 2d 61, 68 (D.D.C. 2008) (finding that evidence in the possession of the party before the judgment was rendered was not "newly discovered evidence" that affords relief from judgment); *Richardson v. National Rifle Ass'n*, 879 F. Supp. 1, at 2 (D.D.C. 1995) (finding that evidence that plaintiff failed to give to his lawyer and that was in plaintiff's possession when the summary judgment motion was being briefed was not "newly discovered" evidence).

[159] App. to Answering Br. at B151, Tab 5 (Apr. 23, 2019 Case Management Order at 2 ("Documents shall be produced on a rolling basis and productions shall be completed on or before August 30, 2019")); *id.* at B156, Tab 5 (Apr. 23, 2019 Case Management Order at 7 ("The parties shall conduct fact discovery so that it is completed on or before November 15, 2019")); *id.* at B1004–05, Tab 33 (Feb. 11, 2020 Case Management Order at 2 ¶ 2 ("All fact depositions and fact discovery shall be completed by June 19, 2020.")).

hearings.[160]

SD3 could have discovered the document well before the *2020 S. J. Decision*. SD3's failure to review the documents in its possession while summary judgment was pending does not support a conclusion that the documents were "newly discovered evidence."

Nor are there any extraordinary circumstances that warrant relief under Rule 60(b)(6). This Court has held that a party must demonstrate "extraordinary circumstances" before a court will grant relief from judgment under that section.[161] Rule 60(b)(6) functions as a catch-all provision, affording relief from the operation of a judgment "for any other reason" justifying relief.[162]

SD3's argument that the COVID-19 pandemic constituted an "extraordinary circumstance" justifying the extraordinary relief fails. SD3 moved for summary judgment

---

[160] At the May 23, 2022, Rule 37 Hearing, the Superior Court made this clear:

> I am in this case, and I remember things, and that is not true. I did not order discovery to be completed for Count I. I have a discovery deadline. I know all of the counts. What I did was, in order to get the process going forward so that you could get relief on Count I, is I made sure that you got the ability to have your expert produce the report, which could then be averaged so that we could come up with the independent valuation. And that is what I am talking about in how we represent what happened here. So it is a little bit broad to say that I ordered discovery to be fully complete by some period -- and I think it was in the winter of a year, and it was 2019 -- and say that I ordered all of the discovery in Count I to be complete. I did not; I did not order that. What I did was I ordered a process to be complete. And that is what I ordered.

*Id.* at B4958–59, Tab 74 (May 2022 Hearing Trans. at 21:21–22:20).

[161] *Bachtle*, 494 A.2d at 1256 (citing *Jewell v. Div. of Soc. Servs.*, 401 A.2d 88, 90 (Del. 1979)).

[162] Del. Super. Ct. Civ. R. 60(b)(6).

44

on March 30, 2020 — during the early days of the COVID-19 pandemic.[163] Although courts have held that the COVID-19 pandemic may constitute an "extraordinary circumstance," the COVID-19 pandemic may not justify relief where a lack of diligence is found.[164] And COVID-19, as disruptive as it was, does not excuse SD3's failure to review the documents that were in its possession for many months.

In addition, and although the parties did not join issue on this point, SD3 could not succeed on such a motion because Rule 60 only applies to a "final judgment, order, or proceeding."[165] At the time SD3 filed its Rule 60 motion on October 19, 2022, there was not yet a final judgment in this case. The final summary judgment order was issued on November 15, 2021.[166] SD3 filed its Rule 37 Motion for Sanctions on April 22, 2022.[167] The Superior Court denied the Motion for Sanctions on June 8, 2022.[168] On July 28, 2022, the parties stipulated to a Partial Dismissal with Prejudice on Count II and CSG's

---

[163] CSG produced the J&T Documents in May of 2020, at the height of the pandemic, when the parties could no longer travel internationally to complete depositions and continue the litigation process. Opening Br. at 13–14; *see also* App. to Answering Br. at B4956, Tab 74 (May 2022 Hearing Trans. at 19:15–22). SD3 therefore contends that CSG should have produced the J&T Documents earlier, along with the other documents related to Count I. Opening Br. at 13–15.

[164] *See O'Rourke v. PNC Bank*, 2021 WL 3507666, at *4 (Del. Super. Ct. Aug. 9, 2021) (explaining that COVID could weigh in favor of justifying relief from judgment provided that counsel also exercised diligence).

[165] Del. Super. Ct. Civ. R. 60(b). In *Ferrellgas Partners L.P.*, we stated that, "[u]nder Delaware law, a 'final judgment' is a judgment that 'determines the merits of the controversy or defines the rights of the parties and leaves nothing for future determination or consideration.'" 2024 WL 2885282, at *19 (quoting *Tyson Foods, Inc. v. Aetos Corp.*, 809 A.2d 575, 579 (Del. 2002). In *West v. Access Control Related Enters., LLC*, this Court held that "Rule 60(b) applies only to final orders." 296 A.3d 378, 385 (Del. 2023).

[166] *2021 Supplemental Decision*, 2021 WL 5710897, at *1.

[167] App. to Opening Br. at A630 (Rule 37 Motion).

[168] App. to Answering Br. at B4557, Tab 79 (*2022 Decision*, at 1).

45

counterclaim.[169]  The stipulation was ordered on August 3, 2022.[170]  On July 3, 2023, this Court denied an appeal from the April 27, 2023 decision denying SD3's motion to amend the *2020 S. J. Decision* because it was an interlocutory appeal.[171]  We noted that the Superior Court's docket reflected that the Superior Court had "not yet acted on the parties' competing forms of final judgment and order[.]"[172]

In the end, SD3's valuation was an 81% increase over the exercise price provided in the Call Option Agreement and more than 75% higher than the Independent Valuation prepared by EY.  The MADR contract that SD3 complains of so vigorously was included in PwC's initial evaluation and was admittedly "unsigned" in 2017.[173]  SD3 was awarded the Penalty Amount.  The Superior Court did not err by denying relief under Rule 60.

> ### C. Whether the Superior Court Erred When It Asked the Parties to Convert the Judgment to United States Currency Using the Conversion Rate on the Valuation Date
>
> #### 1. Contentions on Appeal

Finally, SD3 argues that the Superior Court committed a separate error when it required the parties to convert the Czech Penalty Amount award into U.S. currency.  It points to a statute that it never brought to the Superior Court's attention, namely, 10 *Del.*

---

[169] *Id*. at B4613–14, Tab 83 (Stipulation of Partial Dismissal with Prejudice).

[170] App. to Opening Br. at A10 (Superior Court Record showing dismissal ordered on Aug. 3, 2022 ("So Ordered (Stipulation of Partial Dismissal with Prejudice to Joint Letter to The Honorable Eric M. Davis from Mackenzie M. Wrobel Regarding Partial Settlement)")).

[171] *SARN SD3 LLC v. Czechoslovak Grp. A.S.*, 300 A.3d 679, 2023 WL 4316891 (Del. July 3, 2023) (TABLE).

[172] *Id*. at *1.

[173] App. to Opening Br. at A128 (Amended Complaint at ¶¶ 47).

*C.* § 5207(a). It argues further that the Superior Court compounded that error by using the exchange rate in effect as of the Valuation Date (June 20, 2017), rather than the exchange rate on the payment date required by another section of the same statute, namely, 10 *Del. C.* § 5205(a). CSG responds that SD3 waived the first issue. CSG contends that "[a]s the contract provided for payment and calculation in crowns, the conversion rate should be the rate at the date the payment became due, June 20, 2017[,]" because "[u]sing a current rate for the conversion (as opposed to for post-judgment interest) would result in a windfall to the plaintiff."[174]

### 2. *Standard of Review*

This Court reviews the interpretation of statutes *de novo*.[175]

SD3 did not invoke 10 *Del C.* § 5201, *et. seq.* in the proceedings below.[176] SD3 could have raised the provision after the trial court informed the parties that the case manager required a judgment in U.S. currency. The Superior Court stated only that "[t]he order needs to have 'a conversion identified' on the order, i.e., *somewhere in the judgment*

---

[174] Answering Br. at 67.

[175] *City of Wilmington v. Nationwide Ins. Co.*, 154 A.3d 1124, 1127 (Del. 2017) (citing *Ovens v. Danberg*, 149 A.3d 1021, 1024 (Del. 2016)).

[176] SD3 relies on 10 *Del C.* § 5207(a–b):

 (a) Except as provided in subsection (c) of this section, a judgment or award on a foreign-money claim must be stated in an amount of the money of the claim. Such a judgment or award on a foreign-money claim shall be considered a judgment or claim for an ascertained amount.

(b) A judgment or award on a foreign-money claim is payable in that foreign money or, at the option of the debtor, in the amount of United States dollars which will purchase that foreign money on the conversion date at a bank-offered spot rate.

*it has to be in USD*. Please submit an order with USD."[177]  This request did not preclude the parties from raising the statutory issues.  Instead, the parties only argued about what the date of conversion should be.  As far as the conversion date, SD3, on appeal, again relies on a provision of 10 *Del. C.* § 5201, defining conversion date:

> (3) "Conversion date" means the banking day next preceding the date on which money, in accordance with this chapter, is:
>
> a. Paid to a claimant in an action or distribution proceeding;
>
> b. Paid to the official designated by law to enforce a judgment or award on behalf of a claimant; or
>
> c. Used to recoup, set off or counterclaim in different moneys in an action or distribution proceeding.[178]

But because SD3 did not invoke this statutory provision in the proceedings below, the Superior Court did not have a chance to rule on the statutory interpretation issues now raised for the first time on appeal.  Any arguments now made about these statutory provisions are waived.

Additionally, we observe that throughout the litigation, SD3 asserted inconsistent positions concerning the currency for the Penalty Amount.  Up until the May 2023 and July 2023 proposed judgments, SD3 referred to the Penalty Amount in both currencies, and used the Valuation Date as the operative date.[179]  In response to an interrogatory filed August 16, 2019, SD3 estimated its damages and listed a Penalty Amount of 25% in CZK,

---

[177] App. to Opening Br. at A2506 (July 19, 2023 Email from the Court to the Parties) (emphasis added).

[178] 10 *Del. C.* § 5201(3).

[179] *See, e.g.*, App. to Answering Br. at B1117–19 (MSJ at 16–18).

and the conversion to USD, without clarifying the conversion rate or date.[180]

In the PwC report, the analysts utilized conversion dates from the S&P Capital IQ database "as at the Valuation date."[181] SD3 requested the conversion rate as of the Valuation Date in its Proposed Order Granting SD3's Rule 60 Motion to Amend the Count I Decision, listing the Penalty Amount in both CZK and USD, and writing "[u]sing the conversion rate as of the Valuation Date to be consistent with when pre-judgment interest begins to run."[182]

In sum, the Superior Court's holding addressed the issues as framed and presented by the parties and reflects a careful attempt to balance the interests in this case. We decline to consider any argument regarding statutes that the parties failed to bring to the attention of the trial court.

## IV. CONCLUSION

For the reasons set forth above, we AFFIRM the Superior Court's decision.

---

[180] *Id.* at B3542, Tab 57 (Aug. 16, 2019 Plaintiff SARN SD3 LLC's Objections and Reponses to Defendant Czechoslovak Group A.S.'s Interrogatories at 4 (calculating a Penalty Amount of 25% at 2,513,104,166 CZK, converted to $108,880,057 USD)).

[181] *Id*. at B3245, Tab 45 (PwC Report, Appendix G – Peer Group EBITDA Multiple Range 1 n.18–21, n.18 (various currency conversions as of date of valuation, *e.g.*, "Amount stated in Market Cap section GBP 21,499. Direct conversion GBP/USD from S&P Capital IQ database as at the Valuation date.")).

[182] App. to Opening Br. at A1544 (Proposed Order Granting SD3's Rule 60 Motion to Amend the Count I Decision at 5).